**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

|                         |              |   |                         |
|-------------------------|--------------|---|-------------------------|
| TOMMY THOMPSON,         |              | ) |                         |
|                         |              | ) |                         |
|                         | Plaintiff,   | ) |                         |
| v.                      |              | ) | No. 2:13-cv-00335-JMS-WGH |
|                         |              | ) |                         |
| MARTY HALE, et al.,     |              | ) |                         |
|                         |              | ) |                         |
|                         | Defendants.  | ) |                         |

**Entry Discussing Motion for Summary Judgment**

**I.**
**Introduction**

Tommy Thompson, an inmate currently incarcerated at Wabash Valley Correctional Facility ("Wabash Valley"), filed this suit against several staff members—correctional officers and medical professionals—at Wabash Valley regarding his medical treatment and housing placement after he ruptured his Achilles tendon. Pursuant to 42 U.S.C. § 1983, he alleges that the defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical needs as well as to a serious risk of further injury, and that one of the defendants violated his First Amendment rights by retaliating against him for filing a grievance regarding his treatment. He also brings state law claims. The defendants who are medical professionals—Lolit Joseph, Marilyn Rodriguez, Michael Mitcheff, Michael Rogan, and Maria Gadberry (the "Medical Defendants")—move for summary judgment on all of Mr. Thompson's claims against them. The claims against the remaining defendants are not at issue in this Entry. For the reasons explained below, the Court **grants in part and denies in part** the Medical Defendants' motion for summary judgment. [Filing No. 51.]

## II.
## Summary Judgment Legal Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp*., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.
## Undisputed Facts

Mr. Thompson is, and was at all times relevant to this case, an inmate at Wabash Valley. Prior to April 5, 2013, Mr. Thompson was housed on the 400 range of the F Housing Unit at Wabash Valley, which is an upper range housing unit that can only be accessed by climbing metal grated stairs.[1]

---

[1] The defendants frequently assert in their brief that Mr. Thompson failed to offer evidence to dispute certain evidence they have submitted. This may be because the defendants have overlooked the fact that "[a] verified complaint is the equivalent of an affidavit for summary

On Friday, April 5, 2013, Mr. Thompson severely injured his ankle playing basketball and was unable to walk.  Mr. Thompson was taken to the Wabash Valley medical staff.  Dr. Gregory Haynes decided Mr. Thompson needed to be sent to the emergency room, as he most likely needed an MRI, and prescribed Vicodin for the pain.

Mr. Thompson was taken to the emergency room at Terre Haute Regional Hospital.  The emergency room physician administered tests and determined that, although no bones were fractured, Mr. Thompson had probably ruptured his Achilles tendon.  The discharge notes from the emergency room physician reflect, among other things, that Mr. Thompson should not put any weight on his ankle and should call on Monday, April 8, 2013, to schedule an appointment to see an orthopedic specialist and undergo an MRI.  Upon his return to Wabash Valley, Mr. Thompson was seen by Dr. Haynes, who prescribed him three days of Vicodin and provided him crutches.  Three days later, on April 8, 2013, Mr. Thompson complained of ankle pain, and his Vicodin prescription was renewed.

Mr. Thompson attests that, between April 5 and 8, 2013, he told several Wabash Valley correctional staff[2] and Nurse Marilyn Rodriguez about his ankle injury and that it caused him difficulty getting up and down the stairs to his upper-level housing unit.  He asked each of them to move him to a lower range and issue him a lay-in pass so that he did not have to use the stairs, but they each responded that they could not do that.

---

judgment purposes."  *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *see* 28 U.S.C. § 1746.  And Mr. Thompson submitted a verified complaint.  Therefore, the Court will consider Mr. Thompson's verified complaint in addressing the Medical Defendants' motion for summary judgment.

[2] Because this Entry addresses only the Medical Defendants' pending motion for summary judgment, the Court will not recount the evidence that relates solely to Mr. Thompson's claim against the other defendants.

On April 9, 2013, Dr. Lolit Joseph submitted a request to Dr. Mitcheff that Mr. Thompson undergo an MRI.  Dr. Rogan agreed with Dr. Joseph that an MRI was appropriate.

Later on April 9, 2013, Mr. Thompson was walking on the metal grated stairs with his crutches, when they got stuck on the metal grating, causing Mr. Thompson to lose his balance and fall down half a flight of stairs.  The fall caused Mr. Thompson excruciating pain in his neck, lower back, and right knee.

After his fall, Mr. Thompson was taken to Dr. Joseph, who noted severe tenderness in the back, although no swelling.  Dr. Joseph prescribed Mr. Thompson the anti-inflammatory Mobic and the pain reliever Nalbuphine (in addition to the Vicodin he was still taking), placed him in a neck collar, and ordered that he undergo x-rays.  Lastly, Dr. Joseph ordered that Mr. Thompson be given a bottom bunk, bottom range pass.

 Mr. Thompson's back was x-rayed on April 12, 2013.  It revealed no further injuries, and it was suggested that Mr. Thompson may have suffered a muscle spasm when he fell.

On April 15, 2013, Mr. Thompson had a scheduled medical visit.  Among other things, Mr. Thompson requested information regarding the MRI he was supposed to receive.  At that time, Mr. Thompson was still taking Mobic, but was no longer taking Vicodin.  That same day, Mr. Thompson filed a formal grievance alleging, among other things, that Dr. Joseph was intentionally delaying the treatment of his ankle, as he had yet to have the ordered MRI or surgery.

Mr. Thompson had a scheduled visit with Dr. Joseph on April 17, 2013.  Dr. Joseph's treatment notes reflect that Mr. Thompson's ankle was swollen and causing him pain, and Mr. Thompson requested Vicodin.  Mr. Thompson, however, states that the first thing Dr. Joseph said was, "why did you file a grievance against me?"  [Filing No. 2 at 4.]  Mr. Thompson says he explained to Dr. Joseph the reasons he did so, to which she responded, "you will not be receiving

4

any pain medication," and that he could order pain medication from commissary, which Mr. Thompson told her would take two weeks.  [Filing No. 2 at 4.]  Mr. Thompson attests that, at an unspecified later date, Dr. Rogan apologized for Dr. Joseph's denial of Vicodin.

Mr. Thompson was seen again the next day, April 18, 2013, complaining of swelling and pain.  Dr. Joseph's affidavit states that he was seen by an unnamed "medical provider" about these complaints, and that this medical provider did not make any changes to Mr. Thompson course of treatment at that time.  [Filing No. 52-1 at 4.]  The medical records reflect that Dr. Joseph was Mr. Thompson's "Provider" for this visit.  [Filing No. 52-2 at 38.]

On April 24, 2013, Dr. Mitcheff prescribed Mr. Thompson Vicodin for two weeks, to be taken twice daily.

According to the response to Mr. Thompson's grievance regarding the delay in his MRI, the MRI request was approved on April 26, 2013.  Mr. Thompson returned to the hospital that day for an MRI.  Two days later, on April 28, 2013, Mr. Thompson was seen by a nurse regarding complaints that his leg was swollen and that he wanted more pain medication.  Although the defendants assert that this led Mr. Thompson to be "again" prescribed Vicodin, the medical records reflect, as stated above, that Mr. Thompson was prescribed Vicodin by Dr. Mitcheff two days earlier, and remained on that two-week prescription.

Mr. Thompson's MRI results were available on April 29, 2013.  They showed that he had suffered a complete tear of his left Achilles tendon, that his ankle was still swollen, and there was bruising present.  Based on the MRI results, Mr. Thompson was scheduled for surgery; he went to the hospital for a pre-surgical consultation on May 1, 2013, and his surgery occurred on May 3, 2013.  After surgery, Mr. Thompson was given hydrocodone for the pain and returned to Wabash Valley.  Among other things, Dr. Joseph prescribed Mr. Thompson Vicodin three times daily while

5

he recovered.

## IV.
## Discussion

In his complaint, Mr. Thompson asserted the following four claims: (1) a First Amendment retaliation claim against Dr. Joseph for failing to give him pain medication because he filed a grievance against her; (2) an Eighth Amendment claim alleging that Dr. Joseph, Dr. Mitcheff, Dr. Rogan, and Marla Gadberry were deliberately indifferent to a serious medical need by unnecessarily delaying the MRI on his ankle; (3) an Eighth Amendment claim alleging that Nurse Rodriguez was deliberately indifferent to a substantial risk of serious harm when she failed to act upon his request for a lower bunk or lay in pass; and (4) state law battery and negligence claims against Nurse Rodriguez based on the same allegations as his Eighth Amendment claim against her.  The Medical Defendants move for summary judgment on each of these claims.  The Court will address each in turn.

### A.     First Amendment Retaliation Claim

Mr. Thompson alleges that Dr. Joseph retaliated against him for filing a grievance against her by declining to give him pain medication on April 17, 2013.  To prevail on his First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action."  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *see Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013) ("To establish a prima facie case of retaliation, a prisoner must show that a protected activity . . . was 'at least a motivating factor' in retaliatory action taken against him, i.e., action that would likely deter protected activity in the future.").

6

Mr. Thompson has adduced sufficient evidence to prove each element of his retaliation claim against Dr. Joseph.  As to the first element, "[a] prisoner has a First Amendment right to make grievances about conditions of confinement."  *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010).  Therefore, the act of filing a grievance against Dr. Joseph satisfies the first element.  Second, the withholding of pain killers when a prisoner is suffering from a torn Achilles tendon would likely deter First Amendment activity in the future.

Dr. Joseph most strongly disputes whether the third element is met.  Specifically, Dr. Joseph argues that there is no evidence that Mr. Thompson's grievance was a motivating factor in her decision to not proscribe Mr. Thompson the Vicodin he requested on April 17; instead, she attests that she made a medical decision that his pain was best treated by anti-inflammatory medications available to Mr. Thompson via the commissary given his "low level of observable pain and because of Mr. Thompson's history of drug abuse."  [Filing No. 52-1 at 4-5.]  Further, Dr. Joseph argues that suspicious timing—that is, that Dr. Joseph denied him his request for Vicodin two days after he filed a grievance against her—by itself is insufficient to prove retaliation.

Mr. Thompson's verified affidavit, however, contradicts Dr. Joseph's version of events, and at the summary judgment stage of proceedings, the Court must take Mr. Thompson's affidavit as true.  He attests that on April 17, 2013, the first thing Dr. Joseph did at his appointment was question him as to why he filed a grievance against her, and when he explained, she responded that she would not give him pain medication.  Such evidence, if believed, is sufficient for a reasonable jury to find that Mr. Thompson's grievance was at least a motivating factor in Dr. Joseph's decision to not give Mr. Thompson Vicodin that day.

This is especially true given that there is evidence that would allow a reasonable jury to conclude that both reasons Dr. Joseph gave for her decision were pretextual.  As to her statement

that Mr. Thompson was in a low level of pain, her own medical records reflect that Mr. Thompson said he was in pain and needed Vicodin, his ankle was swollen and tender, and his range of movement in the ankle was limited.  And as to her assessment of his past drug abuse as a basis to deny him Vicodin, this was not a concern on April 5 when he was initially prescribed Vicodin, on April 8 when Dr. Rogan renewed his Vicodin prescription, or, after Dr. Joseph denied him Vicodin, when Dr. Mitcheff again renewed Mr. Thompson's Vicodin prescription on April 24.  In short, two other doctors prescribed Mr. Thompson Vicodin despite his history of drug abuse both before and after Dr. Joseph denied him it on April 17, which undercuts her second rationale for denying Mr. Thompson Vicodin.

A reasonable jury could view the foregoing evidence and conclude that Mr. Thompson's grievance against Dr. Joseph was a motivating factor in her decision to deny him his request for Vicodin on April 17, 2013.  Accordingly, summary judgment on this claim is **denied**.

### B.     Eight Amendment Medical Claim

Mr. Thompson brings an Eighth Amendment medical claim against Marla Gadberry, Dr. Rogan, Dr. Joseph, and Dr. Mitcheff, alleging that they deliberately delayed scheduling his MRI, which caused his unnecessarily pain.

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel.*

8

*Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).  "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain."  *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

The pertinent evidence regarding Mr. Thompson's MRI is as follows:  on Friday, April 5, 2013, Mr. Thompson ruptured his Achilles tendon.  Mr. Thompson was taken to the hospital, and the emergency room doctor concluded that Mr. Thompson likely ruptured his Achilles tendon and, among other things, said that they should call the hospital on Monday, April 8 to schedule an MRI. An MRI was not scheduled on April 8.  On April 9, Dr. Joseph submitted a request to Dr. Mitcheff that Mr. Thompson undergo an MRI, and Dr. Rogan agreed with Dr. Joseph that an MRI was appropriate.  On April 15, during a scheduled medical visit, Mr. Thompson requested information regarding the MRI, and also filed a formal grievance alleging, among other things, that Dr. Joseph was intentionally delaying the treatment of his ankle, as he had yet to have the ordered MRI or surgery.  The response to Mr. Thompson's grievance reflects that the request for an MRI that Dr. Joseph sent to Dr. Mitcheff was "approved and scheduled on April 26, 2013."  [Filing No. 2-5 at 3.]  The MRI results confirmed that Mr. Thompson needed surgery, which was performed on May 3, 2013.

In her affidavit, Dr. Joseph attests that "[t]he amount of time from when Mr. Thompson was injured until he had surgery to repair the tendon was not excessive and caused him no further injury."  [Filing No. 52-1 at 11.]  Further, she attests that "surgery to repair a ruptured Achilles tendon like Mr. Thompson's is not medically indicated immediately after a rupture, as the swelling needs to go down before a proper diagnosis can be made."  [Filing No. 52-1 at 11.]  In the end, she says, Mr. Thompson's surgery was "a complete success" and he experienced no "loss of function,

mobility, or permanent pain as a result of his injury." [Filing No. 52-1 at 11.]

The parties do not dispute that Mr. Thompson's ruptured Achilles tendon constitutes an objectively serious medical condition, or that Drs. Rogan, Joseph, and Mitcheff knew of the injury and the harm it posed. The Medical Defendants, however, argue that the evidence shows that the delay—from April 5 to April 26—in receiving the MRI did not exacerbate his injury or unnecessarily cause him pain.

The Medical Defendants' position is unpersuasive. The foregoing evidence, taken in the light most favorable to Mr. Thompson, would allow a reasonably jury to conclude that Drs. Rogan, Joseph, and Mitcheff were deliberately indifferent to Mr. Thompson's ruptured Achilles tendon by unnecessarily causing him pain by delaying obtaining an MRI as ordered by the emergency room doctor who treated Mr. Thompson. Drs. Rogan, Joseph, and Mitcheff all knew of Mr. Thompson's injury and need for an MRI by April 9, when Dr. Joseph submitted the MRI request to Dr. Mitcheff, a course with which Dr. Rogan agreed. Despite the fact that the emergency room doctor said that they should call the hospital on April 8 to schedule an MRI, an MRI was not scheduled and conducted until April 26.

Although "[d]isagreement . . . between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation," *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014), there is no evidence that Drs. Rogan, Joseph, and Mitcheff disagreed with the course set forth by the emergency room doctor. Indeed, they all agreed that Mr. Thompson needed an MRI. The problem is that, while the emergency room physician essentially thought an MRI should be scheduled as soon as possible, there is no explanation on the part of Drs. Rogan, Joseph, and Mitcheff for the three-week delay. Perhaps in an attempt to explain the delay (although she does not explicitly state as much), Dr. Joseph attests that Achilles tendon

injuries are not "medically indicated immediately after a rupture," and that time is needed for the swelling to go down.  [Filing No. 52-1 at 11.]  But she asserts this generally; noticeably absent is evidence, in Dr. Joseph's declaration or otherwise, that the delay in Mr. Thompson's case was driven by this concern or by any other concern.

In sum, Drs. Rogan, Joseph, and Mitcheff all knew of Mr. Thompson's ruptured Achilles tendon by April 9, but did not ensure that a MRI was scheduled and received until April 26, despite the fact that the emergency room doctor who treated Mr. Thompson on April 5 ordered that they call on April 8 to schedule an MRI.  The record does not reflect a reason for the delay, and thus a reasonable jury could conclude that they were deliberately indifferent to the unnecessary pain— which Mr. Thompson consistently attests was "excruciating"—that the delay caused.[3]  Notably, this is true even if the delay in treatment did not exacerbate his injury or diminish his chances of a full recovery.  *See Gomez*, 680 F.3d at 865-66 (holding that the plaintiff stated an Eighth Amendment claim because "even though this [four-day] delay [in treatment] did not exacerbate [the plaintiff's] injury, he experienced prolonged, unnecessary pain as a result of a readily treatable condition"); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.").

For these reasons, the Medical Defendants' motion for summary judgment with respect to Drs. Rogan, Joseph, and Mitcheff is **denied** as to this claim.  However, unlike these three doctors,

---

[3] The Court recognizes that some "delays in treatment are inevitable, particularly absent a life-threatening emergency," but the evidence does not establish that the delay here was "minimal []or justified by [Mr. Thompson's] status as a prisoner" such that it is not actionable.  *Berry*, 604 F.3d at 442.  According to his testimony, which the Court must credit here, Mr. Thompson was required to move around the prison with a completely ruptured Achilles tendon for three weeks, all while in consistent and "excruciating" pain.

there is no evidence Marla Gadberry personally participated in the decision-making regarding Mr. Thompson's MRI, and thus summary judgment is **granted** to her on this claim. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.").

### C.      Eighth Amendment Claim Regarding Lower Level and Lay-in Pass

Mr. Thompson brings an Eighth Amendment claim against Nurse Rodriguez,[4] alleging that she was deliberately indifferent to a substantial risk of serious harm when she did nothing in response to his request for a lower level or lay-in pass and he subsequently injured himself when he fell down half a flight of stairs on April 9, 2013.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). "Liability exists 'only if [the defendant] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *O'Brien v. Ind. Dept. Corr. ex rel. Turner*, 495 F.3d 505, 508 (7th Cir. 2007) (quoting *Farmer*, 511 U.S. at 847).

Nurse Rodriguez argues that she is entitled to summary judgment because the medical records reflect that her only involvement with Mr. Thompson's medical care was a nurse visit following his off-site MRI on April 26, 2013. But this ignores Mr. Thompson's sworn assertion that between April 5 and 8, 2013, he told several staff, including Nurse Rodriguez, about his injury

---

[4] Mr. Thompson also asserts this claim against correctional officer defendants. Those defendants, however, are not participating in the instant motion for summary judgment, and have recently filed a notice of settlement [Filing No. 89]. Therefore, in this Entry, the Court addresses this claim only with respect to Nurse Rodriguez.

and that he was having difficulty getting up and down the stairs; Mr. Thompson attests that he therefore asked Nurse Rodriguez and others that "he be moved to a lower range and be given a lay-in pass," but she told him she could not do that.  Simply put, Mr. Thompson has submitted evidence that he communicated specifically with Nurse Rodriguez that he needed to be moved to the lower range, and she did nothing.  Her later treatment of Mr. Thompson on April 26 is irrelevant to this claim.

Mr. Thompson's evidence, taken as true at this stage of the proceedings, is sufficient to establish an Eighth Amendment violation.  Falling down metal grated stairs constitutes "serious harm," despite Nurse Rodriguez's assertion to the contrary.  Unlike the potential harm from a typical inmate slipping and falling, for example, on a slippery floor, which falls outside the Eighth Amendment, *see Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014), the potential harm is much greater for an inmate such as Mr. Thompson who is on crutches with a ruptured Achilles tendon attempting to navigate a metal grated staircase.

For similar reasons, there was a "substantial risk" of Mr. Thompson falling down the stairs given his use of crutches with a ruptured Achilles tendon (on which he could not put any weight). Moreover, Mr. Thompson's evidence shows that he specifically informed Nurse Rodriguez of his injury and his difficulty on the stairs because of it, thus she was subjectively aware of the risk of harm and did nothing to abate it.  This is sufficient to establish deliberate indifference.  *See O'Brien*, 495 F.3d at 508.

Nurse Rodriguez resists this conclusion on the ground that there is no evidence she had any authority to place Mr. Thompson on the lower level.  But the question is whether she disregarded the "risk by failing to take reasonable measures to abate it."  *Id.*  According to Mr. Thompson, she did not nothing to abate the risk.  For example, she could have informed other medical staff or

13

correctional officers—whoever had final authority over the decision—of the situation.  For this reason alone, her argument fails.

Furthermore, in response to one of Mr. Thompson's grievances regarding the failure to place him on the lower range, a correctional officer stated that policy was for medical staff to recommend a lower level placement.  Specifically, the correctional officer said that he was "never contacted about Offender Thompson wanting a lower range cell," and that the protocol for such a request is that "[m]edical gives a recommendation to Unit Team whenever there is an offender that needs placement due to medical needs."  [Filing No. 2-6 at 3.]  This fact would allow a reasonable jury to conclude that Nurse Rodriguez had the ability to take steps to abate the risk Mr. Thompson faced, but she deliberately declined to do so.[5]

Accordingly, Nurse Rodriguez's motion for summary judgment as to this claim is **denied**.

### D.    State Law Claims

Mr. Thompson asserts state law negligence and battery claims against Nurse Rodriguez.[6] The Court must first assess whether it will exercise supplemental jurisdiction over these claims before analyzing their merits.

---

[5] Notably, immediately after Mr. Thompson fell down the stairs, the medical records reflect that Dr. Joseph ordered Mr. Thompson to be placed on the bottom bunk in a cell on the lower level range.

[6] Mr. Thompson, in his response brief, contends that his state law claims are against all the defendants, not just Nurse Rodriguez.  In his complaint, Mr. Thompson clearly set forth each of his claims and against which defendants those claims were brought.  He will not be permitted to amend his complaint through his response to the Medical Defendants' motion for summary judgment.  As to the state law claims, among the Medical Defendants he listed only Nurse Rodriguez.  He also brought these claims against correctional officer defendants who have recently filed a notice of settlement.  Accordingly, Mr. Thompson's state law claims will proceed against Nurse Rodriguez, only.  As noted above, the Court will only address these claims with respect to Nurse Rodriguez in this Entry.

1.    *Supplemental Jurisdiction*

This Court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").  When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Court concludes that the relevant factors weigh in favor of exercising supplemental jurisdiction over Mr. Thompson's state law claims.  Judicial economy and convenience both weigh in favor of this Court deciding Mr. Thompson's state law claims.  The factual predicate for his state law claims and the defendants against whom the claims are asserted are essentially the same as that for his Eighth Amendment claim regarding the failure to issue him a cell on the lower level of the facility.  The consideration of fairness to the parties does not strongly favor one outcome over the other.  While comity weighs in favor of relinquishing supplemental jurisdiction, the Court can apply the relevant Indiana law in this case.  Accordingly, the Court will exercise supplemental jurisdiction over Mr. Thompson's state law claims, as judicial economy and convenience outweigh the comity concerns in this case.

2.        *Merits*

Nurse Rodriguez seeks summary judgment on the merits of both Mr. Thompson's battery and negligence claims.   Turning first to the battery claim, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results."  *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007).

Nurse Rodriguez is entitled to summary judgment on Mr. Thompson's battery claim. Although she did nothing in response to his request to be moved to the lower level, there is no evidence that she acted with the intention to cause the "harmful or offensive contact" over which Mr. Thompson complains—falling down a half flight of metal grated stairs.  *Id.*  Simply put, Nurse Rodriguez did not contact Mr. Thompson, nor did she cause an imminent apprehension thereof, by failing to act in light of his request to move to the lower level.

Turning to Mr. Thompson's negligence claim, Nurse Rodriguez first argues that the claim is subject Indiana Medical Malpractice Act ("IMMA"), and because there is no evidence that he complied with the IMMA by submitting his claim to the medical review panel, she is entitled to summary judgment.

The test for whether a negligence claim is covered by the IMMA is "whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services."  *Terry v. Community Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App. 2014).  "A case sounds in ordinary negligence [rather than medical negligence] where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community.  By contrast, a claim falls under the [IMMA] where there is a causal

16

connection between the conduct complained of and the nature of the patient-health care provider relationship." *Id.* (citation and quotation marks omitted).

The Court does not construe Mr. Thompson's negligence claim as one falling within the IMMA. As noted, the basis for Mr. Thompson's negligence claim is nearly identical as that of his Eighth Amendment claim regarding the failure to move him to the lower level range, which required him to walk on metal grated stairs while on crutches and with a ruptured Achilles tendon. He argues that Nurse Rodriguez and multiple correctional officers were negligent in requiring him to walk up and down the metal grated stairs on crutches. Whether or not this was negligent does not require "application of the standard of care"; instead, "the factual issues are capable of resolution by a jury." *Id.* This is demonstrated by the fact that the jury would make the same assessment of whether the defendants were negligent as to both Nurse Rodriguez and the correctional officers. In short, the claim revolves around whether it was safe to require Mr. Thompson to climb up and down the stairs given his condition. This type of claim "sounds in ordinary negligence," and thus is not subject to the IMMA's requirements. *Id.*

As to the merits of the claim, Nurse Rodriguez is not entitled to summary judgment on it for the same reasons she is not entitled to summary judgment on his Eighth Amendment claim discussed in Part IV.C above. If a reasonable jury could conclude that Nurse Rodriguez was deliberately indifference to a serious risk of harm by failing to act after Mr. Thompson requested to be housed on the lower level, it could equally conclude that she was negligent in failing to do so.

For these reasons, Nurse Rodriguez's motion for summary judgment is **granted** with respect to Mr. Thompson's battery claim, and **denied** with respect to his negligence claim.

**V.**
**Conclusion**

For the reasons set forth above, the defendants' motion for summary judgment is **granted**

**in part** and **denied in part**.  [Filing No. 51.]  Summary judgment is **denied** as to the following

claims, which will proceed to trial:

- First Amendment retaliation claim against Dr. Joseph;

- Eighth Amendment medical claim against Drs. Rogan, Joseph, and Mitcheff regarding

  their delay in obtaining an MRI for Mr. Thompson;

- Eighth Amendment claim against Nurse Rodriguez regarding her alleged failure to do

  anything in response to Mr. Thompson's request for placement on the lower level; and

- State-law negligence claim against Nurse Rodriguez regarding her alleged failure to do

  anything in response to Mr. Thompson's request for placement on the lower level.

Summary judgment is **granted** as to the following claims:

- Eighth Amendment medical claim against Marla Gadberry; and

- State-law battery claim against Nurse Rodriguez.

No partial final judgment shall issue at this time.  A scheduling order will be issued after

the resolution of the correctional officer defendants' motion for summary judgment, should they

choose to file one.

**IT IS SO ORDERED.**


Date: <u>January 7, 2016</u>

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

TOMMY THOMPSON   198302
Wabash Valley Correctional Facility
Electronic Service Participant -- Court Only

Electronically Registered Counsel